THE CZARINA.

(District Court, S. D. New York. March 16, 1907.)

SHIPPING—CONTRACT FOR REPAIR OF VESSEL—DOCK TRIAL OF BOILER.

An agreement to prepare a steam yacht for a dock trial does not mean that the repairer shall furnish a new boiler, if the dock trial develops leaks, and especially when it is subsequently shown that the boiler was so faulty in construction that it was necessary to replace it with one of a different type.

In Admiralty.

Hyland & Zabriskie, for libellant.
Nicoll, Anable & Lindsay and Archibald R. Watson, for claimant.

ADAMS, District Judge. This action was brought by the Tietjen & Lang Dry Dock Company to collect from the steam yacht Czarina the sum of $1,883.79 for making repairs upon the yacht in July and August, 1906. The yacht was claimed by the owner and an answer interposed denying that the repairs were properly made or the boat de-

livered according to agreement, in consequence of which the owner was unable to use the yacht or fulfil a contract he had made for her charter during the season to his damage in the sum of $1,500.

The controversy arose out of a contract made between the libellant and the owner, through his agents, Cox & Stevens, yacht brokers. The latter applied to the libellant to have some work done on the yacht, asking for a written proposition and when it was received, Mr. Cox told the libellant to go ahead and do the work. The written proposition was as follows:

"Hoboken, N. J., July 28th, 1906.

Specification for work on Yacht 'Czarina.'

Dock; clean bottom; paint bottom two (2) coats of approved anti-corrosive paint, one (1) coat of anti-fouling; paint top-sides two (2) coats White; chip and recement guard; inside bulwarks one (1) coat buff; gild scroll in bow and name in stern; scrape deck and deck-house seams and repay same where open, with marine glue; either paint or stain and varnish plank-sheer as directed; rub down and varnish outside of deck-house, hatches, sky-lights, and gratings:—Nine Hundred and Sixty-seven Dollars, ($967.00).

To prepare engine, boiler, and auxiliaries, except ice and electric light plants, for dock trial, doing only such work as is absolutely necessary, not to exceed the sum of Five Hundred and Seven Dollars, ($507.00), and to keep as much below this as possible.

To do such extra work as may be decided on at cost to be agreed.

To have the above work completed by noon, August 8th, 1906.

Yours respectfully,      Tietjen & Lang Dry Dock Co.

Geo. G. Raymond, Superintendent.

To Messrs. Cox & Stevens, New York City."

It appears that several days before this letter was prepared and delivered, which was the day of its date, Mr. Raymond, who signed it on behalf of the libellant, visited the yacht at the request of Mr. Cox, where she was lying at Staten Island, probably the 24th of July, and made an examination of all her accessible parts. Mr. Cox then told Mr. Raymond that there was an opportunity to charter the yacht provided the necessary work for effecting that purpose could be done within a certain amount and in time for her delivery on the 10th of August. Mr. Cox said that Mr. Raymond told him that he saw nothing radically wrong in any department of the vessel, that the boilers appeared to be in good condition, as far as he could see, and he thought he could do the work within the time and for the money that Mr. Cox mentioned. The yacht was subsequently removed to the yard of the libellant and another examination of the boiler made by Mr. Lang and a boiler maker belonging to the yard, which seem to have been satisfactory and the contract was accordingly made as set forth in the above letter. During the last conversation, the specification of a dock trial, which was incorporated in the contract was first mentioned by Mr. Cox. The boiler was a pipe boiler.

Work was immediately commenced and continued from day to day. It was practically finished by noon of August 7th, when a hydrostatic test of the boiler was made about 11 o'clock A. M. by the United States Inspectors, who did not report any leak and passed the boiler. In the afternoon of the same day, a steam test was applied to the boiler and the next morning a leak developed in one tube and the libellant repaired it before 6 o'clock that evening. The steam test was continu-

ed and another leak in one tube developed, which was repaired by 11 o'clock the night of the 9th. The steam test was continued and another leak developed about 2 o'clock in the morning of the 11th. The owner took the boat away about 6 o'clock in the morning of the 11th without any request on his part that the libellant should repair this leak and the boat left the libellant's yard with one tube leaking. She was then taken up the Hudson River to the charterer's residence at Ardsley, the tube leaking considerably on the way. The charterer came aboard about 8 o'clock and notwithstanding the leak agreed to try the boat and they proceeded down the bay to adjust the compasses and then went to Newport, the boiler leaking badly on the way but not so excessively in Newport as en route there, as the steam pressure was down while in port. From Newport they went back to Ardsley, when the charterer threw up the contract on account of the condition of the boiler, having announced his intention to do so at Newport. The leaky tubes were then plugged up and about two weeks later the boat was again chartered for a term to go to Bar Harbor and she started. On the way there, the tubes became very leaky again and the boiler would not hold the fresh water required. Resort was had to salt water and the destination was reached. The new charterer came aboard and said he would like to lie there a couple of days and then take a trip further east. The master consulted with the engineer and then went ashore and ordered twenty-five new steel plugs for the boiler. They were not used, however, and it was determined that night it was not safe to go to sea with the boiler leaking the way it was but they tried it for a short trip the next morning at the charterer's request. They did not get far, however, on account of the condition of the boiler and the vessel was finally towed back to New York for the purpose of getting a new boiler. The boiler which is the subject of this dispute was new and in apparently good condition but of an improper construction for such use and was finally taken out of the yacht and a new boiler put in.

The principal dispute here arose out of the meaning of the words:

"To prepare engine, boiler, and auxiliaries * * * for dock trial, doing only such work as is absolutely necessary, not to exceed the sum of Five hundred and seven Dollars ($507.00) and to keep as much below this as possible."

The libellant contended that this was perfectly clear and needed no explanation and objected to any testimony as to the meaning of the language. The claimant, on the other hand, contended that it had a more extended meaning than the simple words would cover. After hearing the parties in court, I concluded to take the testimony.

Mr. Cox said:

"I understand that a dock trial of a vessel's boilers is a trial for the purpose of determining whether the boilers and the machinery connected therewith are in condition for actual service, and that the test or trial must be sufficiently rigorous to determine that point.

Q. Does it require as you understand the term a steam test—a test including steam pressure? A. You cannot test a boiler in any way that I know of for its working qualities without having steam in the boiler, steam pressure.

Q. How long should that pressure be sustained in order to complete the test of the trial, as you understand it? A. Judging from my experience I should say that a 24-hour test under good pressure would be required in an

average case to satisfy people who are responsible for the condition of the vessel that she is ready to go to sea.

Q. A sustained test of 24 hours of steam pressure? A. In my judgment, as an average."

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"Q. I desire to ask you Mr. Cox, what the phrase 'preparing for dock trial' means as used in contracts with reference to the fitting out of boats?

Ans. To put the boilers, engines and auxiliaries in such condition that they will stand a test at the dock.

Q. What sort of a test? A. I hadn't quite finished. A test at the dock, which test is to represent as nearly as possible the uses to which the engines, boilers and auxiliaries are put while the vessel is in service. And my understanding of the phrase 'to prepare' for such a trial is that the parts of the vessel shall be put in condition to stand such a trial."

## Mr. Raymond said in substance:

A dock trial means a trial of the engines and boilers to determine if anything is wrong, and preparing for a dock trial means assembling the parts for a test.

## Mr. Lang said:

"It is to prepare the engines and auxiliaries and boilers ready for trial, and then when they are prepared put water in the boiler, get up steam and try them, try every part of the machinery that is—auxiliaries and main engines and boilers."

## Mr. Fletcher said:

"It means to assemble all the working parts, put them together so they can be tried with steam. 'Dock trial' means in the ordinary acceptation of the term, and does mean as matter of fact, trial by steam at the dock:

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*

. It means what it says, 'To prepare the vessel for that trial.' It don't mean to conduct that dock trial but to prepare it for dock trial.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*

Q. In case it develops on a dock trial such as you have testified to tha. there are some defective parts to the engine and boiler, such as a leaking tube, in your opinion is there anything in this contract requiring the contractor to repair those tubes as part of the agreement? A. Not in that contract.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*

The object of the dock trial is to determine defects that may exist in either an old boat or a new one. That is the only object of the trial.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*

A. They were to assemble the parts, put the vessel together, put her in shape so that a steam trial might be conducted, get her ready for steam trial.

Q. Then I ask you to go a little further and imagine a case where she wouldn't stand steam trial, where she showed leaks as soon as steam was gotten up. Would you say she had been made ready for dock trial? A. Yes, because the dock trial is to develop these leaks, that is what the dock trial is made for—and it does it in a new boat—invariably; that is the very object of the trial.

Q. You would say that, notwithstanding the fact that she could not stand the trial, could not stand the test, she was nevertheless prepared for it if her parts were assembled? A. For a dock trial, yes sir."

## Captain Moulton said:

" 'Dock trial,' as I have always supposed and looked at it, was to have everything ready and to try the vessel out well in every way, shape and form—all the auxiliaries, pumps, boilers, steam winches, steam steering gear, electric light plant and everything—without it was otherwise specifically stated; to try everything out good and hard, because when a ship has had a dock trial she is supposed to be ready to go to sea, and I have always made it a point

to put as hard a trial on the ship as I could before I went out of Sandy Hook.

Q. What do the words 'prepare for dock trial' mean? A. To put everything in first class shape without otherwise specified. That is what I would term it."

### Mr. Dickey said:

"Q. I will ask you to state, Mr. Dickey, what the obligation imposed upon a contractor is who undertakes to prepare a steam vessel, her engines, boilers and auxiliaries, for dock trial? A. It means to put everything in shape— to put water in the boilers, get fire under it and turn the engines over.

Q. That implies steam pressure, does it not? A. Yes, sir.

Q. How long should that steam pressure be sustained? A. Oh, four hours is considered an ordinary dock trial. It takes sometimes much longer but four hours is a very usual time for a dock trial.

Q. How much pressure should be sustained for the four hours? A. Full working pressure, whatever the boiler is allowed.

\* \* \* \* \* \* \* \* \* \*

Then, Sir, if a contractor who undertakes to prepare a vessel for dock trial does not make her stand a dock trial she is not prepared, is that right? A. No sir.

Q. It is not right? A. No sir, she is not prepared for dock trial if she does not stand it."

### On cross examination he said:

"Q. You don't mean that if the boiler explodes under the test he is to put a new boiler in? A. It all depends on the terms of the agreement.

Q. The words are that the Tietjen & Lang Company is 'To prepare the engine, boiler and auxiliaries' of this boat for dock trial? A. Yes, sir.

Q. What counsel has been asking you is what that means? A. He has got to put that machinery in condition to stand a dock trial.

Q. Do you mean if when pressure is applied to the boiler it explodes he has got to put in a new boiler? A. Yes, sir. I certainly think so.

Q. You think if I employ you to prepare my vessel for a dock trial and she is all ready for trial and when the test is applied the boiler explodes, you would have to put in a new boiler? A. I should think so, under the wording of that contract."

### Mr. Bowers said:

"Ans. It means that all the parts mentioned shall be put in condition so they will stand successfully a trial at the dock which will approach, as near as possible, the conditions under which the ship will operate finally. It is taken as a precautionary measure, as any defects which develop can be remedied at the ship yard much better than at sea.

Q. State of what a dock trial consists? A. A dock trial consists in the operating of the machinery at their full power successfully.

Q. For how long? A. For such time as it shall be demonstrated to the satisfaction of all concerned that it is working successfully.

Q. What is considered the time for such a test, a sufficient time for such a test? A. Until it is demonstrated to all parties concerned that the machinery is capable of performing her functions properly. It might be two or three hours, four hours or all day.

Q. Then, Sir, if after two or three hours a boiler showed a leak and the fires were drawn and the tubes plugged and steam were gotten up again, and the same process gone through with two or three times and still showing a leak on the final attempt at a test, would you say that that vessel has stood a dock test or not? A. I should think she had had an unsuccessful trial, several of them; that she had had no dock trial, for the dock trial was started and never finished."

On cross examination he said:

"Q. I am going to ask you the same question that I asked of Mr. Cox, whether it is your opinion as an expert—referring to this clause in the contract—that if when the test is applied to the boiler it should explode and blow out a portion of the deck the contractor would be required to replace the boiler and a new deck? A. I should say most positively not only that but would be liable for damages for delay and show incompetency in putting steam. on a boiler that would explode."

Some of these definitions have been subjected to a test by the questions quoted on cross examination and found to be obviously wanting in correctness as applied to this contract. Here was a vessel supposed to be in a seaworthy condition but needing some repairs and then to be subjected to a trial to ascertain her efficiency for service. There was. no guaranty by the libellant that the results of the repairs or test would remove any inherent defects in the boiler, for example, but merely that if they existed they should be ascertained and repaired so far as discovered at a cost not to exceed a certain sum. To assume that this meant that the defects should be remedied by the libellant without regard to cost beyond a limited sum, specified in the contract, would be putting a construction on the language which would lead to absurd results. As it turned out, the defects in the boiler were such that they could not be cured by repairs, as the final result of the owner's attempts in that direction showed. It was necessary in the end that the boiler should be replaced with one of a different type. This trouble existed from the beginning and all attempts to remedy it, resulted in nothing excepting expense to the owner. The libellant examined the boiler but was not called upon to condemn it. Its duty was to make repairs and prepare for a dock trial. If a dock trial meant that the boiler should be made efficient for service, then evidently the language did not contemplate or cover a situation requiring the libellant to pay the expense and cannot be made to do so by any testimony of experts. The libellant examined the yacht before the contract was made and found nothing radically wrong in any department of the vessel and that the boiler seemed to be in good condition so far as its agent could see and then the contract was made for various repairs and a test of the boiler. Such test, repeated several times, showed that the boiler was defective in construction, and subsequent experiments conclusively indicated that though nearly new, it would have to be replaced, as was done before the yacht could be used.

I conclude that the libellant did the work as agreed and is entitled to a decree. I conclude also that the claimant has no offset. If necessary, a reference can be had to determine the amount of the libellant's recovery.